UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

LUIS SOTO,

                    Plaintiff,

              -against-

CITY OF NEW YORK, NYPD OFFICER
JASON STEFANO, Shield No. 15604, NYPD
OFFICER LAWRENCE THOMAS, Shield No.
23859, NYPD OFFICER EDWIN FLOREZ,
Shield No. 22262, NYPD OFFICER WILLIAM
BEATTIE, Shield No. 2878, and JOHN/JANE
DOE POLICE OFFICERS 1-2,

                    Defendants.

**COMPLAINT**

<u>Jury Trial Demanded</u>

-------------------------------------------------------- x

       This is an action to recover money damages arising out of the violation of Plaintiff Luis Soto's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

       1.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

       2.     The Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

       3.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) as Plaintiffs reside in the District and the claim arose in the District.

## JURY DEMAND

       4.     Plaintiff respectfully demands a trial by jury of all issues in the matter pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

       5.     Plaintiff is a citizen of New York County in the City of New York.  The events

described herein occurred in New York County.

6.      Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

7.      Defendant CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, the City of New York.

8.      That at all times hereinafter mentioned, Defendant NYPD Officer Jason Stefano, Shield No. 15604, Defendant NYPD Officer Lawrence Thomas, Shield No. 23859, Defendant NYPD Officer Edwin Florez, Shield No. 22262, Defendant NYPD Officer William Beattie, Shield No. 2878, and John/Jane Doe NYPD Officers 1-2, were duly sworn members of the NYPD and were acting under the supervision of said department and according to their official duties.

9.      That at all times hereinafter mentioned the Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

10.      Each and all of the acts of the Individual Defendants alleged herein were committed by said Defendants while acting within the scope of their employment by Defendant City of New York.

## FACTS

11.      On or about the evening of July 4, 2014, Plaintiff was with a group of neighbors and friends near the corner of West 193rd Street and St. Nicholas Avenue eating barbecue.

12. Plaintiff had just thrown away the remnants of a plate of food when Individual Defendants suddenly appeared and charged at him.

13. Individual Defendants were in plainclothes and Plaintiff did not know who they were or what they wanted and so he became frightened and ran from them. However, as Individual Defendants were already coming towards him at some speed when Plaintiff saw them as he was standing still, Defendants reached him in a brief moment, tackled him and began to beat and kick him. Onlookers protested Defendants' actions. In particular they pleaded with them to stop assaulting Plaintiff's head, but Defendants continued to beat Plaintiff, despite the fact that they had in an instant taken him to the ground where he was completely prone and submissive. When the beating waned, one of the Defendants placed his foot on top of Plaintiff's head in a show of dominance and to continue the threat to Plaintiff's physical safety.

14. On information and belief, Defendant Stefano and Defendant Thomas were among the Individual Defendants who assaulted Plaintiff. In addition, on information and belief, Defendant Florez and Defendant Beattie were involved either by personal involvement or at the very least by virtue of being there when the beating occurred and failing to intervene. As best Plaintiff can recollect, there were at least four but perhaps up to six police officers involved in the assault.

15. As a consequence of the assault, Plaintiff suffered a concussion, extensive swelling of his head and face, abrasions on the side of his head, bruises and abrasions on his elbows, knees and hands where he was dragged on the concrete and hit and kicked, and more.

16. Individual Defendants, who later claimed that they acted against Plaintiff when they saw him sell a narcotic, did not arrest the alleged buyer. In addition, Individual Defendants searched Plaintiff and found no contraband. Individual Defendants nonetheless handcuffed and arrested Plaintiff, locked him in a police bus/van and transported him to the precinct, which was

roughly ten to twelve blocks away. Defendant Thomas sat directly next to Plaintiff on a bench seat. As Plaintiff can best recollect, Defendant Stefano drove, and the two other Defendant Officers sat on a bench seat directly in front of him and Defendant Thomas.

17.    When the Parties arrived at the precinct, Defendant Thomas roughly shoved Plaintiff as he got out of the van, causing Plaintiff to fall and land awkwardly and painfully on his arm. As Plaintiff attempted to get up, an Individual Defendant (who on information and belief was also Defendant Thomas) punched Plaintiff in the eye.

18.    As the group walked into the precinct, an Individual Defendant threw Plaintiff's wallet and keys into a garbage can.

19.    Defendants took Plaintiff to New York Presbyterian Hospital for medical treatment of the injuries he suffered as a result of the assault.

20.    After New York Presbyterian Hospital discharged Plaintiff, he was taken to the infirmary at Manhattan Detention Center as he awaited arraignment.

21.    In reliance upon false statements made about Plaintiff by Defendant Stefano and Defendant Thomas, the D.A.'s Office commenced a criminal charge against Plaintiff for criminal possession of a controlled substance in the third degree.

22.    Defendant Stefano falsely stated that he had seen Plaintiff sell drugs to someone right before the arrest. This was not true. Again, Defendants did not arrest the alleged buyer in the alleged transaction and Defendants searched Plaintiff on the scene and found no contraband.

23.    On information and belief, in order to compensate for Defendants' failure to collect evidence before arresting Plaintiff to provide cause to believe he had sold narcotics, Defendant Thomas falsely stated that, after Plaintiff was unloaded from the police van, Defendant Thomas found a small amount of cocaine in the van. Defendant Thomas unreasonably attributed possession of that cocaine to Plaintiff.

4

24.     Assuming Defendant Thomas found narcotic in the van at all, Defendant Thomas's statement about Plaintiff possessing the narcotic was unreasonable for a number of reasons.  First, Defendants had thoroughly searched Plaintiff prior to placing him in the police van and found no contraband.  It being July and hot, Plaintiff was wearing one layer of light clothes such that the officers' search was not complicated by many folds and pockets where Plaintiff might hide things.  Second, Plaintiff was handcuffed throughout the van ride to the precinct with Defendant Thomas sitting directly next to him.  As a consequence, Defendant Thomas's accusation is that Plaintiff, who had already been searched by a team of law enforcement agents on the scene, achieved a silent, imperceptible, Houdini-esque retrieval of extremely well hidden narcotics while mere inches away from Defendant Thomas and as Defendant Thomas watched him.  According to Defendant Thomas, he only learned of Plaintiff's feat later, when he allegedly found drugs in the van.  Assuming, for the sake of argument only, that Defendant Thomas found drugs in the van, it was unreasonable to impute the possession of the drugs to Plaintiff considering the NYPD previously used that same vehicle to transport scores of other arrestees.  It stands to reason that some of those arrestees were seized for narcotics-related activity such that the cocaine that Defendant Thomas claimed to find in the van could just as easily have been any arrestee transported in the vehicle.

25.     In reliance upon Defendants' false statements (false statements which omitted material details such as those I have mentioned above as representative examples), the D.A.'s Office charged Mr. Soto with a felony narcotics offense and resisting arrest.

26.     The state court set Plaintiff's bail very low due to Plaintiff's lack of serious criminal history.  Once released from custody, Plaintiff received additional medical treatment for his injuries.  He also complained about the incident, triggering an IAB investigation.

27.     It was not until January 2015, nearly six months later, that the People presented Plaintiff's case to a grand jury.  The grand jury returned a true bill against Plaintiff but, on information and belief, and for the reasons described, supra, one or more Defendants fabricated facts and suppressed actual facts in order to corrupt the grand jury's decisionmaking process. For example, and as described above, the relevant facts are that: (1) police did not arrest the alleged buyer in the alleged narcotics sale even though it allegedly occurred contemporaneously with Plaintiff's arrest as Defendants watched; (2) Defendants searched Plaintiff on the scene but found no contraband; (3) Defendant Thomas sat with Plaintiff, who was handcuffed at the time, during the ten-block van ride to the precinct, such that it is not plausible to think that Plaintiff was able to successfully use that opportunity to retrieve hidden contraband unnoticed from a place on his person which Defendants were unable to discovery by the earlier search, and discard it; (4) the van frequently transported many arrestees and was not frequently cleaned such that it was not reasonable to imput possession of anything found on its floor to Plaintiff; and more.  On information and belief, at least one of the Defendants presented facts surrounding the arrest to the grand jury that were different, simpler, and much more favorable to the People than the facts actually were on the night of the incident.  As a consequence, a reasonable civil jury in this action could plausibly find that the "grand jury presumption" relative to probable cause is rebutted on the record of this case.

28.     Plaintiff's case continued on until March 2016 when the state court dismissed the charges on speedy trial grounds.

29.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to a custom, policy and/or practice of: detaining innocent persons without cause in order to meet

"productivity goals," or arrest quotas; detaining individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting those individuals.

30.     The aforesaid incident is not an isolated incident.  It is a product of Defendant City's unconstitutional customs and policies which may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts. The City is on clear notice that its policies and customs have caused and continue to cause chronic constitutional violations from (1) the number of Civil Rights Lawsuits filed against it and its law enforcement officers (which, on information and belief, the City does not adequately track in order to identify problem precincts and/or problem officers), (2) the number of Notices of Claim ("NOC") filed against the City and its law enforcement officers and the City's inadequate responses to those NOCs, (3) the number of Complaints filed with the Civil Complaint Review Board ("CCRB") against the City's law enforcement officers, (4) City Council hearings, (5) newspaper reports, (6) criminal cases resulting in declined prosecutions and dismissals, and (7) judicial rulings suppressing evidence and finding officers incredible as a matter of law.  Taken together, all of these red flags demonstrate that a troubling number of NYPD officers unlawfully search and seize New Yorkers without probable cause, bring charges against New Yorkers with no legal basis, perjure themselves in charging instruments and through testimony, use excessive force against individuals, and fail to intervene in and report the obviously illegal actions of their fellow officers, inter alia.

31.     Policymaking officials of the City and NYPD implemented plainly inadequate policies, procedures, regulations, practices, and customs, including but not limited to the

following: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet "productivity goals"; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision. By failing to properly train, supervise and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

32. Former Deputy Commissioner Paul J. Browne, as reported in the press on January 20, 2006, stated that NYPD commanders are permitted to set "productivity goals," permitting an inference of such a custom or policy encouraging deprivations of individuals' constitutional rights in cases such as this one.

33. Defendant City of New York is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights. Despite such notice, Defendant City of New York has failed to take corrective action. This failure caused Individual Defendants in this case to violate Plaintiff's constitutional rights. For decades, the City has been on notice that certain precincts and certain police officers are disproportionately responsible for civil rights lawsuit liability. Nonetheless, the City has failed to take action to track such information in order to hold precincts or officers accountable through disciplinary action or programs of reform. See, e.g., Wyatt v. Cole, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 lawsuits is to deter state actors from using the badge of their authority

to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.").

34.     One of the more recent examples of the City failing to make use of Civil Rights Lawsuit data to improve law enforcement's record vis-à-vis the protection of individuals' rights occurred in 2014 when the City Council considered whether the NYPD should have to produce quarterly reports about complaints against the department.  Among other things, the reports would indicate whether an officer who was the subject of a complaint had "previously been the subject of a civil action or actions alleging police misconduct" so that tailored attention could be given to an open and obvious existing and/or developing problem.  See Azi Paybarah, Council Seeks Regular Reports On NYPD Complaints, May 5, 2014, at

http://www.capitalnewyork.com/article/city-hall/2014/05/8544832/council-seeks-regular-reports-nypd-complaints (last accessed May 21, 2016).

35.     NYPD Commissioner Bill Bratton publicly opposed these reporting requirements. In June 2015, Commissioner Bratton stated that "[r]ather than enacting a set of reporting bills that impose information-sharing as a mandate, [the NYPD and the City Council] should sit down together and work out how relevant information may be shared, taking into account the manner in which the information is collected and maintained—and our available resources."  See New York Police Department Commissioner William Bratton, Statement Before The New York City Council Public Safety Committee, June 30, 2015, at http://nypdnews.com/2015/06/police-commissioner-brattons-statement-before-the-new-york-city-council-public-safety-committee/ (last accessed May 21, 2016).

36.     The City's failure to compile and employ Civil Rights Lawsuit data in this manner is surprising when one considers the trove of data that this represents.  For example, between 2009 and 2014, the City paid an average of $33,875 per case to resolve well over 10,000

cases.  See Caroline Bankoff, <u>The City Has Paid Almost Half a Billion Dollars in NYPD-Related</u> <u>Settlements Over the Past 5 Years</u>, Oct. 12, 2014, available at:

http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html

(last accessed May 26, 2016).  Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD has risen from $99 million to $217 million in between 2005 and 2014.  While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct.  See Office of the Comptroller, <u>Claims Report: Fiscal Years 2013 and 2014</u>, available at

http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf.

37.     In 2009, the City Council noted that study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action, but again, this elicited no significant change in the City's methods.  See Christopher Dunn and Robert Perry, <u>Reporting By The New York City Corporation Counsel On</u> <u>Civil Damage Claims Related To Police Misconduct</u>, 2009, at

http://www.nyclu.org/content/reporting-new-york-city-corporation-counsel-civil-damage-claims-related-police-misconduct (last accessed May 26, 2016).

38.     By failing to keep track of crucial data, which could save lives as well as taxpayer money, the City has created a system in which lawsuits are treated as unrelated to their potential deterrent effect.

39.     The City is also on notice that it employs policies and practices which are presently insufficient to identify law enforcement's chronic violations of individuals' civil rights because recent Civil Rights Lawsuits and Criminal Prosecutions amply document systemic

problems which the NYPD resists addressing, as evidenced by its opposition to reporting

protocols and officer recidivism analyses.  By way of example,

a. In Schoolcraft v. City of New York, 103 F. Supp. 3d 465 (S.D.N.Y. 2015), the Court found that evidence showed an issue of fact as to whether the City had a custom of retaliation against whistle blowers.  Among the record evidence was expert witness testimony about a "blue wall of silence," which is a "police culture that prizes intense loyalty, unity and solidarity among police officers to the extent that any officer reporting the wrongdoing of another officer would be in violation of the code and subject to retaliation."  In addition, IAB-run focus groups had revealed that "physical fear surfaced several times [in participants] during the discussion on reporting corruption."

b. In Colon v. City of New York, No. 09 Civ. 0008 (JBW), 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009), the Court denied the City's motion to dismiss the civil rights plaintiff's Monell claim against it for insufficient pleading, finding that:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of **repeated, widespread falsification by arresting police officers of the New York City Police Department**.  Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—**there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged**.

(emphasis added).  In response, NYPD Commissioner Raymond Kelly said that when this misconduct "happens, it's not for personal gain. It's more for convenience."  See Loren Yaniv and John Marzuli, Kelly Shrugs Off Judge Who Slammed Cops, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.

c. In People v. Arbeeny, Index No. 6314-2008 (N.Y. Sup. Ct., Kings County), former undercover NYPD narcotics officer Steve Anderson testified about the frequency with which he observed a law enforcement officer planting narcotics on a suspect in order to make an arrest that would held the officer meet his or her monthly quota of arrests.  In order to achieve this, according to Anderson, an officer

would carry a stash of narcotics to plant on innocent civilians, a practice that he called "attaching bodies." According to Anderson,

> It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it – being around so long, and being an undercover.

See, e.g., John Marzulli, We Fabricated Drug Charges Against Innocent People To Meet Arrest Quotas, Former Detective Testifies, Oct. 13, 2011, at http://www.nydailynews.com/ crime/fabricated-drug-charges-innocent-people-meet-arrest-quotas-detective-testifies-article-1.963021 (last accessed May 26, 2016); Jim Dwyer, The Drugs? They Came From The Police, Oct. 13, 2011, at http://www.nytimes.com/2011/10/ 14/nyregion/_those-drugs-they-came-from-the-police.html?_ R=0 (last accessed May 26, 2016).

In response to the testimony, the presiding judge, New York Supreme Court Justice Gustin Reichbach stated

> Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.

d. In People v. William Eiseman, Index No. 2999-2010 (N.Y. Sup. Ct., New York County), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, admitting to faking a marijuana case against one man and cocaine-related charges against another – and training subordinate officers to falsify paperwork to sidestep legal safeguards. See, e.g., NYPD Sgt. William Eiseman Pleads Guilty To Lying Under Oath In Plea Deal, New York Daily News, June 27, 2011, at http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288 (last accessed May 26, 2016).

a. In or around 2007, the United States Attorney's Office investigated the 109th precinct of the NYPD for "planting drugs on suspects and stealing cash during gambling raids." The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose." John Marzulli, Claims of Corruption in Kings

Precinct Put Crooked Cop's Sentencing on Hold, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-Kings-precinct-put-crooked-sentencing-hold-article-1.296352 (last accessed May 26, 2016).

e.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel.  In connection with the incident, it was revealed that as many as two dozen similar cases had come to light in the preceding year.

> That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

See Murray Weiss, NYPD In A Liar Storm, N.Y. Post, Oct. 26, 2009, at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVogv4Ndeqcl (last accessed May 26, 2016).

f.  In Bryant v. City of New York, Index No. 22011/2007 (N.Y. Sup. Ct., Kings County), a jury found that the NYPD had a policy "regarding the number of arrests officers were to make that violated [the] plaintiff's constitutional rights and contributed to her arrest."  See Oren Yaniv, Court Rules That Cops Do Use Quotas; Woman Injured In 2006 Arrest Settles For $75,000, New York Daily News, Feb. 19, 2011 (last accessed May 21, 2016).

g.  In MacNamara v. City of New York, No. 04 Civ. 7922 (RJS) (JCF) (S.D.N.Y), Docket No. 542, the Court granted the Plaintiffs' motion to approve a class-wide settlement reached in a case demonstrating evidence that police officers systematically perjured themselves in sworn statements in order to justify the unlawful mass arrests of 1,800 demonstrators during the 2004 Republican National Convention.

h.  In White-Ruiz  v. City of New York, 983 F. Supp. 365, 380 (S.D.N.Y. 1997), the Court stated that it found the Mollen Commission's July 7, 1994 report investigating "Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department" to be "entirely reliable." Among other things, the Mollen Commision reported that NYPD "[o]fficers who report misconduct are ostracized and harassed; become targets of complaints and even physical threats; and are made to fear that

they will be left alone on the streets in a time of crisis.  This draconian enforcement of the code of silence fuels corruption because it makes corrupt cops feel protected an invulnerable."

    i.    In <u>Ariza  v. City of New York</u>, No. 93 Civ. 5287 (CPS), 1996 WL 118535, at *6 (E.D.N.Y. Mar. 7, 1996), the Court denied the defendants' summary judgment motion on the question of whether the City had a custom of retaliation against police corruption whistle blowers, stating that a reasonable jury could plausibly find that the plaintiff's evidence "establishes both a widespread usage and a failure to train in the police department."

40.    These cases are but a small drop in the ocean of Civil Rights Cases and Criminal Prosecutions which tend to reveal that the NYPD has been shown over and over to have a culture of unconstitutional customs and practices, specifically with regard to the a culture of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence, and covering for one's colleagues when they engage in this misconduct, results in individuals suffering false arrest, false imprisonment, malicious prosecution, and other constitutional torts.

41.    It is thus manifestly clear through the litigation brought in federal and state courts in the City that even if the City was not the intentional architect of polices and routinized conduct causing chronic violations of individuals' constitutional rights, it was certainly on notice of the practice.  By failing to take any meaningful corrective steps and instead choosing to put out fires whenever they break out (which is often), the City has ratified, endorsed, and otherwise communicated its acceptance of these policies and customs to the officers it employs.

42.    The City's opposition to or refusal to consider adopting more robust data collection, analysis and reporting practices, despite knowing those practices' benefits, has been longstanding.

43.    Moreover, on information and belief, and in addition to the Defendant City's lack of an appropriate systematic approach to such problems, Defendant City was also aware, prior to

the incident, that the Individual Defendants named here lacked the objectivity, temperament, maturity, discretion and disposition to be employed as police officers. Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train and supervise them.

44. All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

45. All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

46. The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto.

47. The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYPD, all under the supervision of ranking officers of said department.

48. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

49. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
### 42 U.S.C. § 1983

50.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

51.     Defendants, by their conduct toward Plaintiff alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983 and the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

52.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

53.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
### FALSE ARREST AND MALICIOUS PROSECUTION

54.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

55.     Defendants violated the Fourth and Fourteenth Amendments because they arrested and/or detained Plaintiff without reasonable suspicion or probable cause, then maliciously commenced a criminal proceeding action against him, still without probable cause.

56.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his  constitutional rights.

57.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

**THIRD CLAIM**
**EXCESSIVE FORCE**

58.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

59.     The level of force employed by Individual Defendants was excessive, objectively unreasonable and otherwise in violation of Plaintiff's Fourth Amendment and Fourteenth Amendment rights.

60.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff was subjected to excessive force and sustained the injuries hereinbefore alleged.

**THIRD CLAIM**
**DEPRIVATION OF FAIR TRIAL AND FABRICATION OF EVIDENCE**

61.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

62.     Defendants' false statements deprived Plaintiff of a fair trial by, among other things, representing fabricated facts knowing that they were material and that they would reach a jury of Plaintiff's peers at a trial.

63.     As a direct and proximate result of Defendants' unlawful fabrication of evidence, Plaintiff was deprived of his right to a fair trial and sustained the injuries hereinbefore alleged.

**FOURTH CLAIM**
**FAILURE TO INTERVENE**

64.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

65.     The Individual Defendants actively participated in the aforementioned unlawful conduct and observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

66.     Accordingly, the Individual Defendants who failed to intervene violated the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

67.     Individual Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

68.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## MONELL

69.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

70.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

71.     The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiff's rights as described herein.  As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

72.     The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for

professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

73.     The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYPD constituted deliberate indifference to Plaintiff's safety, well-being and constitutional rights.

74.     The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff as described herein.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiff respectfully requests the following relief:

A. An order entering judgment for Plaintiff against Defendants on each of his claims for relief;

B. Awards to Plaintiff for compensatory damages against all Defendants, jointly and severally, for their violation of Plaintiff's Fourth, Fifth, Sixth and Fourteenth Amendment rights, the amount to be determined at jury trial, which Plaintiff respectfully demands pursuant to FRCP 38;

C. Awards to Plaintiff of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to Plaintiff's constitutional rights and welfare, the amount to be determined at jury trial, which Plaintiff respectfully demand pursuant to FRCP 38;

D. Awards to Plaintiff of the costs of this action, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:     July 25, 2016
               New York, New York

                                     /s

Ryan Lozar  (RL0229)
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562

*Attorney for Plaintiff Luis Soto*